UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| AXIS CONSTRUCTION COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VILLAVO INC. f/k/a<br>BMARKO STRUCTURES INC., and<br>ARGONAUT INSURANCE COMPANY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)  Civil No.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# COMPLAINT

Plaintiff Axis Construction Company ("Axis" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Defendants Villavo Inc. f/k/a BMarko Structures Inc. ("BMarko") and Argonaut Insurance Company (the "Surety"), states as follows:

1. Axis brings this action to preserve and enforce its rights under a performance bond issued by the Surety in order to recover damages resulting from BMarko's breach of and refusal and/or failure to fulfill its obligations under a written sub-contract with Axis to provide services, labor, and materials for the construction of a mobile base for the United States Navy. This action has been commenced in order to preserve and perfect Axis' rights under the performance bond and to prevent the potential expiration of the suit limitation period stated in the bond. The parties are simultaneously engaged in an arbitration before the American Arbitration Association (the "AAA"), commenced by BMarko, that will not be resolved prior to the potential expiration of that suite limitations period stated in the performance bond, despite commencement of the arbitration. Axis is concurrently moving to

stay this action pending the resolution of the matters before the AAA, including a determination of the amounts due to Axis by BMarko and the Surety.

## THE PARTIES

2.  Axis was, and still is, a corporation duly organized and existing under and by virtue of the laws of the State of New York with offices located at 125 Laser Court, Hauppauge, New York 11788.

3.  Upon information and belief, BMarko is a corporation duly organized and existing under and by virtue of the laws of the State of Georgia, with its principal place of business located at 2624 Weaver Way, Suite 200, Atlanta, GA 30340.

4.  Upon information and belief, the Surety is, and at all times mentioned was, a corporation organized and existing under the laws of the State of Illinois, with its principal place of business located in Cook County, Illinois, and has been authorized to transact an insurance and bonding business within the State of Maine as a surety company.

## JURISDICTION AND VENUE

5.  Jurisdiction over this action is conferred by 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in dispute is in excess of $75,000.00.

6.  Venue within the District of Maine is appropriate under 28 U.S.C. §1391 and under the terms of the performance bond, because the events giving rise to the claims and the construction project at issue are located within the District of Maine.

## FACTS RELEVANT TO ALL CLAIMS

7.  On or about August 28, 2020, non-party Asturian Group Inc. d/b/a Asturian Construction ("Asturian") entered into a written agreement with Naval Facilities Engineering Systems Command of the United States Navy Mid Atlantic Region ("NAVFAC") to serve as Prime Contractor for a project for the construction and delivery of fifty (50) separate mobile units, or boxes, that were

to be constructed offsite, delivered to the Portsmouth Naval Shipyard, Kittery Maine 03904, and assembled on site to provide a temporary base and known as "B151 UTIL & TRLRS" (the "Project", as more fully set forth in the relevant agreements) (the "Prime Contract").

8. On or about October 16, 2020, Asturian entered into a written agreement with Axis to provide the labor, materials and services for the design, construction and delivery of the mobile units for the Project (the "Asturian Agreement").

9. Section 6(A) of the Asturian Agreement provides, among other things, that "[i]f Asturian is assessed liquidated damages for any failure to timely complete the Work, then Asturian shall also assess such liquidated damages to [Axis] in proportion to [Axis'] share of the responsibility for such delay."

10. The Asturian Agreement further provides for liquidated damages in the amount of $2,239.00 per day.

11. Section 18 of the Asturian Agreement provides that Axis "shall be liable to Asturian for any damages, actual or liquidated, which Asturian may sustain as a result of the failure or delay by [Axis] in the performance of the Work as scheduled. If any Work proves defective or deficient, such defects or deficiencies shall, as required by Asturian, be corrected and repaired by [Axis] at [Axis'] expense to the satisfaction of Asturian."

12. On or about November 12, 2020, Axis, as contractor, and BMarko, as subcontractor, entered into an agreement (the "Subcontract") wherein BMarko would construct and deliver the fifty (50) mobile units or boxes to the Project.

13. The Subcontract provided, among other requirements, that BMarko perform its work in a timely manner in accordance with the Construction Schedule attached to the Contract.

14. Section 4.4 of the Subcontract provides that "If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within five working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, by appropriate Modification, and without prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the reasonable cost thereof from the payments then or thereafter due the Subcontractor."

15. Section 8.2.1 of the Subcontract provides that if BMarko "repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within a ten-day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, [Axis] may, by written notice to [BMarko] and without prejudice to any other remedy [Axis] may have, terminate the Subcontract and finish [BMarko's] Work by whatever method [Axis] may deem expedient. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing [BMarko's] Work and other damages incurred by [Axis] and not expressly waived, such excess shall be paid to [BMarko]. If such expense and damages exceed such unpaid balance, [BMarko] shall pay the difference to [Axis]."

16. The original date for Substantial Completion of the Work under the Subcontract was August 19, 2021, subject to adjustments of time pursuant to the terms of the Subcontract.

17. Section 10.3 of the Subcontract provides that "[i]n the event that [BMarko] fails to achieve Substantial Completion of the Work … within the time required by the Project Schedule, other than as a result of an Event of Force Majeure, Amendment(s) to the Agreement, a delay caused by [Axis] or [Axis'] failure to satisfy its obligations set forth in the Agreement, [BMarko] shall credit [Axis] $2,239 per business day, up to an aggregate amount not to exceed the Subcontract Sum." These

liquidated damages mirrored the liquidated damages that Asturian was permitted to assert against Axis in the Asturian Agreement for delay.

18.     Sections 7.1.1, 7.2, and 7.3 of the Subcontract provide that the method of binding dispute resolution for "[a]ny claim arising out of or related to this Subcontract" shall be arbitration administered by the American Arbitration Association in accordance with its Construction Industry Rules in effect on the date of the [Subcontract]".

19.     To secure the performance by BMarko of the terms and conditions of the Subcontract, BMarko executed and delivered to Axis a performance bond, dated November 23, 2020 (the "Bond").

20.     Section 1 of the Bond provides that the Subcontract is "incorporated herein by reference", and such incorporation includes the dispute resolution provisions of the Subcontract requiring the parties, including the Surety, to arbitrate any claim arising out of or related to the Subcontract.

21.     In 2021, after months of being late, and incorrect in its deliverables, and not having even begun procurement of the materials to construct the boxes, BMarko demanded in excess of more than $660,000 in payments it claimed were due under the Subcontract, $956,000 in delay costs, and an extension of time to complete the work until April 2022.

22.     In order to resolve all issues through July 2021, on or about July 29, 2021, Axis and BMarko entered into an amendment of the Subcontract, which set forth, *inter alia*, a revised Construction Schedule (the "July 13, 2021 Construction Schedule"), identified the final drawings and specifications, set deadlines for BMarko's deliveries and completion of the Subcontract, as well as other conditions for the issuance of the remainder of payments to BMarko (the "Modification").

23. BMarko was paid an additional $350,000 above the Subcontract price just to get BMarko to return to work and complete the Subcontract, conditioned upon BMarko's compliance with the terms of the Modification. BMarko did not comply.

24. Pursuant to Section 5(f) of the Modification, if BMarko failed to complete the work in accordance with the July 13, 2021 Construction Schedule, BMarko would not be entitled to any further payments and would be required to accelerate the work at its sole cost and expense.

25. The Modification extended the Substantial Completion date to be no later than December 30, 2021.

26. BMarko repeatedly failed to perform its work in accordance with the Subcontract and Modification, including, but not limited to, the following:

   a. Failing to correct deficiencies, defaults and non-conforming work identified in multiple notices sent by Axis to BMarko;

   b. Repeatedly failing to perform in accordance with the July 13, 2021 Construction Schedule;

   c. Repeatedly failing to properly submit submittals required by the Subcontract and Modification, resulting in multiple delays to the work;

   d. Failing to conform to the Issue for Construction Building/Anchor/MEP Final Design Documents attached as Exhibit B to the Modification;

   e. Failing to timely provide a recovery schedule and plan to complete all required work and necessary work to cure multiple deficiencies, defects and non-conforming work;

   f. Failing to complete and submit the required worksheets and commissioning documents required for Project close out;

   g. Abandoning the Project by failing and refusing to complete the Work; and

   h. Failing to properly oversee and supervise subcontractors hired by BMarko, resulting in multiple deficiencies, defects, and non-conforming work.

27. Despite Axis' numerous written notices to BMarko, including notices pursuant to Section 4.4 of the Subcontract, BMarko repeatedly failed to commence and continue corrective work within five (5) working days.

21113184.1

28. As a result of BMarko's failure to correct the work, Axis was caused to perform corrective work to cure BMarko's defects and non-conforming work, resulting in damages of, at least, $356,088.26 which continue to accrue.

29. In addition, Asturian has incurred costs to cure BMarko's defects and non-conforming work, in an amount to be determined at trial, that Asturian has deducted as backcharges from amounts otherwise due to Axis pursuant to the Asturian Agreement.

30. Upon information and belief, Asturian has incurred at least $94,000 to remedy or complete work that BMarko failed to perform correctly or to complete, which costs continue to increase as additional deficiencies arise.

31. The electrical deficiencies include numerous defective, incomplete and/or improperly installed items identified by Asturian during an inspection conducted in May 2023 that did not comply with the required codes.

32. Further, Asturian has advised Axis that BMarko improperly wired lights in both a first and second floor restroom, and the faulty wiring resulted in the creation of arcs that burned insulation in each restroom (in separate incidents) and left burn marks on the lights.

33. These costs constitute damages incurred by Axis as a result of BMarko's breaches of the Subcontract.

34. BMarko also failed to achieve substantial completion of the work by December 30, 2021, the substantial completion date set by the Modification, causing numerous delays to the Project.

35. Pursuant to Sections 4.3.1 and 10.3 of the Subcontract, BMarko is liable to Axis for liquidated damages in the amount of $2,239.00 per business day for BMarko's failure to substantially complete the work on or before December 30, 2021.

36. In the event that the Navy assesses liquidated damages for delay against Asturian, and Asturian asserts that any portion of said liquidated damages are attributable Axis under Section 6(A) of the Asturian Agreement, BMarko is also liable for the amount of such liquidated damages as a result of BMarko's failure to achieve Substantial Completion as required by the Modification.

37. On June 2, 2023, in accordance with Section 8.2.1 of the Subcontract, Axis sent BMarko written notice of default, demanding that BMarko commence and continue to correct its defective and non-conforming work.

38. Despite due demand, BMarko failed to commence and continue to correct its defective and non-conforming work within ten (10) days after receipt of Axis' written notice.

39. On June 16, 2023, in accordance with Section 8.2.1 of the Subcontract, Axis sent BMarko written notice that the Subcontract was terminated due to BMarko's failure to commence and continue correction of defective work.

40. As a result of BMarko's repeated failures under the Subcontract and Modification, Axis has been damaged in an amount to be determined at trial, but in no event less than, $459,150.26, plus attorneys' fees, costs and expenses incurred in connection with this proceeding.

## AS AND FOR AXIS' FIRST CLAIM
### (Breach of Contract)

41. Axis repeats, reiterates, and realleges the allegations contained in Paragraphs "1" through "40" set forth above with the same force and effect as if set forth at length herein.

42. On or about November 12, 2020, Axis, as contractor, and BMarko, as subcontractor, entered into the Subcontract.

43. The Subcontract, including the Modification, is a valid and binding contract.

44. BMarko breached the Subcontract by, among other things, failing to perform the work required thereunder, or performing the work in a defective and/or deficient matter, as detailed above.

45. Despite notice and the opportunity to cure required by the Subcontract, BMarko failed to commence and continue the cure of the defective and/or deficient work, or to complete the work it failed to perform, as required by the Subcontract.

46. Axis properly terminated the Subcontract by letter dated June 16, 2023.

47. As a result of BMarko's breaches of the Subcontract, Axis has been damaged in an amount to be determined at trial, but in no event less than $459,150.26, as well as any additional damages (liquidated or otherwise) that may be asserted by Asturian and/or the Navy in connection with BMarko's breach of the Subcontract.

### AS AND FOR AXIS' SECOND CLAIM
### (Breach of Performance Bond)

48. Axis repeats, reiterates, and realleges the allegations contained in Paragraphs "1" through "47" set forth above with the same force and effect as if set forth at length herein.

49. To secure the performance by BMarko of the terms and conditions of the Subcontract, BMarko executed and delivered to Axis a performance bond, dated November 23, 2020.

50. The Bond was issued by the Surety.

51. Section 1 of the Bond provides that the Subcontract is "incorporated herein by reference", and such incorporation includes the dispute resolution provisions of the Subcontract requiring the parties, including the Surety, to arbitrate any claim arising out of or related to the Subcontract.

52. By notices dated February 22, 2022 and May 11, 2022, pursuant to Section 3.1 of the Bond, Axis notified the Surety that Axis was considering declaring BMarko in default under the Subcontract.

53. Pursuant to Section 3.1, a conference was held in May 2022 with representatives from Axis, the Surety, and BMarko, during which it was agreed that BMarko would be given an opportunity to perform its remaining obligations under the Subcontract.

54. Thereafter, BMarko failed to perform its remaining obligations, as set forth in detail above.

55. By letter dated June 2, 2023, Axis declared BMarko in default under the Subcontract, and notified the Surety of the same.

56. By letter dated June 16, 2023, Axis terminated the Subcontract and notified the Surety of the same.

57. Axis advised the Surety that the costs to finish BMarko's work under the Subcontract are far in excess of the Balance of the Contract Price (as defined in the Bond) and it is BMarko's, and the Surety's, obligation to pay damages to Axis (along with any liquidated damages). In essence, the Balance of the Contract Price is a credit owed to Axis.

58. Axis has fully performed its obligations under the Subcontract, and there is no "Owner Default" as defined in section 14.4 of the Bond.

59. Axis has made all efforts to mitigate its damages, including but not limited to correcting the defective and deficient work BMarko refused and failed to correct after demand by Axis.

60. Axis notified the Surety that there was no "Owner Default", as defined in section 14.4 of the Bond, that Axis has performed its obligations under the Subcontract, and is not in default of the Subcontract. Axis further noticed the Surety that Axis made all efforts to mitigate its damages caused from BMarko's defaults in performance of the Subcontract.

61. On July 17, 2023, Axis made written demand to the Surety pursuant to Section 6 of the Bond that the Surety perform its obligations thereunder and take action pursuant to Section 5 of the Bond, and advised the Surety that if the Surety did not do so, it would be in default under the Bond.

62. Axis has complied with all conditions precedent and obligations under the Bond, including, but not limited to, providing the Surety with the requisite notices under Sections 3 and 6 of the Bond.

63. The Surety failed to take action pursuant to Section 5 of the Bond within seven days of receipt of the July 17, 2023 notice.

64. The Surety has breached and is continuing to breach the Bond.

65. By reason of the foregoing, Axis is entitled the Surety's performance under the Performance Bond and judgment in an amount to be determined at trial, but in no event less than $459,150.26, plus attorneys' fees, costs and expenses incurred as a result of BMarko's default and the Surety's failure under the Performance Bond, as well as any additional damages (liquidated or otherwise) that may be asserted by Asturian and/or the Navy in connection with BMarko's breach of the Subcontract.

## AS AND FOR AXIS' THIRD CLAIM
### (For Declaratory Relief)

66. Axis repeats, reiterates, and realleges the allegations contained in Paragraphs "1" through "65" set forth above with the same force and effect as if set forth at length herein.

67. The Bond is a contract pursuant to which the Surety has certain obligations to Axis, including performance of BMarko's obligations once BMarko is in default of the Subcontract, payment of liquidated damages to Axis, and payment of legal fees and costs incurred by Axis as a result of BMarko's defaults and the Surety's failure to perform under the Bond.

68. For the reasons outlined herein, the Surety has breached and is continuing to breach the terms of the Bond.

69. The Surety failed to take action pursuant to Section 5 of the Bond within seven days of receipt of the July 17, 2023 notice.

70. An actual and justiciable controversy exists as to the parties' rights and obligations under the Bond.

71. A declaratory judgment would have an immediate and direct impact on the parties' conduct.

72. Based on the foregoing, Axis is entitled to a declaratory judgment declaring that (i) the Surety has breached the Bond by failing to take action pursuant to Section 5 thereof; (ii) that Axis has fulfilled the conditions precedent required to recover pursuant to the terms of the Bond; and (iii) that the Surety is required to fulfill its obligations thereunder including payment of an amount to be determined at trial, but in no event less than $459,150.26, plus attorneys' fees, costs and expenses incurred as a result of BMarko's default and the Surety's failure under the Bond, as well as any additional damages (liquidated or otherwise) that may be asserted by Asturian and/or the Navy in connection with BMarko's breach of the Subcontract.

**WHEREFORE**, Axis requests the following relief Axis the following relief:

    a. With respect to Axis' First Claim, a judgment for money damages against BMarko in an amount to be determined at trial, but in no event less than $459,150.26, plus attorneys' fees, costs and expenses incurred in connection with this proceeding, as well as any additional damages (liquidated or otherwise) that may be asserted by Asturian and/or the Navy in connection with BMarko's breach of the Subcontract;

    b. With respect to Axis' Second Claim, a judgment for money damages against the Surety under the Bond in an amount to be determined at trial, but in no event less than $459,150.26, plus attorneys' fees, costs and expenses incurred as a result of BMarko's default and the Surety's failure under the Bond, as well as any additional damages (liquidated or otherwise) that may be asserted by Asturian and/or the Navy in connection with BMarko's breach of the Subcontract

    c. With respect to Axis' Third Claim, a declaratory judgment declaring that (i) the Surety has breached the Bond by failing to take action pursuant to Section 5 thereof; (ii) that Axis has fulfilled the conditions precedent required to recover pursuant to the terms of the Bond; and (iii) that the Surety is required to fulfill its obligations thereunder; including payment of an amount to be determined at trial, but in no event less than $459,150.26, plus attorneys' fees, costs and expenses incurred as a result of BMarko's default and the Surety's failure under the Performance Bond, as well as any additional damages (liquidated or otherwise) that may be asserted by Asturian and/or the Navy in connection with BMarko's breach of the Subcontract; and

    d. Such other relief as the Court deems just and proper.

Dated: November 3, 2023

                                            PRETI, FLAHERTY, BELIVEAU &
                                            PACHIOS, CHARTERED, LLP

                                            */s Adam Shub*
                                            Adam J. Shub, Esq.
                                            One City Center
                                            PO Box 9546
                                            Portland, Maine 04112-9546
                                            (207) 791-3000
                                            ashub@preti.com
                                            *Attorney for Plaintiff*